UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHANNON MULDROW,

     Plaintiff,

v.                            Case No: 8:21-cv-2674-KKM-JSS

MERRICK GARLAND,
Attorney General of the United States,

     Defendant.

_____

## ORDER

For field Supervisor Special Agent (SSA) positions, the FBI designates any opening as stationary, nonstationary, or flex. A position's designation affects the ranking of candidates based on whether they have FBI headquarter experience. For stationary positions, those in the field receive preference; for nonstationary, those at headquarters or with headquarters experience receive preference; and for flex, both kinds of applicants are treated equally. Because the nonstationary designation preferences headquarter experience, a field-experience-only applicant will always be ranked lower than someone with FBI headquarter experience, regardless of other qualifications or competencies.

The above sorting never considers the sex of the applicant. Nonetheless, FBI Special Agent Shannon Muldrow, a mother of three without experience at FBI headquarters,

alleges that the designations disparately impact women because women who work at field offices are less likely to have experience at FBI headquarters than their male counterparts. Her theory turns on the idea that women in the FBI are more likely to be married to a spouse that also works and that the FBI women remain the primary caregivers to minor children. As a result of those familial duties, women cannot as easily complete temporary assignments or relocate to FBI headquarters. Thus, they are disadvantaged in the ranking system when applying for nonstationary positions.

Based on the above, Muldrow sues the Attorney General under Title VII, alleging three claims: disparate impact discrimination, disparate treatment discrimination,[1] and retaliation. 3d Am. Compl. (Doc. 78). The Attorney General moves to dismiss Muldrow's complaint, arguing that Muldrow failed to exhaust several of the grievances and that Muldrow fails to state a claim under Rule 12(b)(6) for the remainder of the claims. MTD (Doc. 85). For the forgoing reasons, the Attorney General's motion is **GRANTED**.

## I.   BACKGROUND

Special Agent Shannon Muldrow has served at the FBI for twenty-three years. 3d Am. Compl. ¶ 19. In 2000, after Muldrow graduated from Quantico, the FBI assigned her to the Tampa Field Division. *Id.* Muldrow remained a member of the Tampa Field

---

[1] "[T]he central difference between disparate treatment and disparate impact claims is that disparate treatment requires a showing of discriminatory intent and disparate impact does not." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1278 (11th Cir. 2000).

Division until she was reassigned to the Puerto Rico Field Division in August 2022. *Id.*
¶¶ 18–29. Muldrow alleges that her superiors at the Tampa Field Division began
discriminating against her in 2019.

Many of Muldrow's allegations focus on the FBI's methodology for ranking job
applicants. As stated above, the FBI's Tiering Policy classifies candidates from FBI
headquarters or who have fifteen months of temporary travel duty experience at FBI
Headquarters as Tier I candidates for "nonstationary" positions. Candidates from field
offices (like Muldrow) are Tier II candidates for those positions. *See* Feb. MTD Exhibit 1
(Doc. 63-1 at 43–44). The reverse is true if the position is "stationary." If a position is
"flex," the location of a candidate does not affect the candidate's tiering status. 3d. Am.
Compl. ¶ 46. Regardless of a candidate's skill ratings, Tier I candidates are automatically
ranked higher than Tier II candidates competing for an open position. *Id.*

Muldrow's first grievance occurred on August 7, 2019. On that date, she was told
that she was not selected for a Squad 10 SSA position, which had been designated as "flex."
*Id.* ¶¶ 57, 71. Muldrow claims that the FBI discriminated against her on account of her
sex and parental status. *Id.* ¶ 72. Although the FBI reposted the Squad 10 SSA position
on August 22, 2019, the position was redesignated as "nonstationary," *id.* ¶¶ 79–81, 83,
meaning that applicants with FBI Headquarters experience would be given automatic
preference over applicants from field offices. Muldrow alleges that the FBI intentionally

3

reposted the position as "nonstationary" to disadvantage her and award the position to a pre-selected male applicant. *Id.* ¶¶ 84, 87.

A couple months after Muldrow was not selected for the "nonstationary" Squad 10 SSA position, she filed a formal Equal Employment Opportunity (EEO) complaint alleging that the FBI's actions constituted unlawful sex discrimination. Resp. to MTD Exhibit 1 (Doc. 92-1.) After she filed the first EEO complaint, Muldrow alleges that the FBI unlawfully discriminated against her with respect to four other promotions: the First Squad 9 SSA Promotion, the Panama Express SSA Promotion, the Second Squad 9 SSA Promotion, and the Squad 11 SSA Promotion. Compl. ¶¶ 94–119. Muldrow submitted additional EEO complaints related to these incidents. Resp. to MTD Exhibits 2, 4, 5. (Doc. 92-2; Doc. 92-4; Doc. 92-5).

Further, the FBI allegedly retaliated against Muldrow for submitting formal EEO complaints. *Id.* ¶¶ 154, 172–77. Muldrow alleges that the FBI posted the Squad 10 SSA position, the Panama Express SSA position, and the Squad 11 SSA position as "nonstationary" to retaliate against her. *Id.* ¶¶ 178–81. Additionally, Muldrow claims that she suffered retaliation when the FBI failed to adjudicate an appeal that she initiated with the Special Agent Midlevel Management Selection System Board Appeal Committee at the FBI Headquarters. *Id.* ¶¶ 166–171. Muldrow also alleges that the following incidents constitute retaliation:

4

- In March 2020, Kristin Rehler—the Assistant Special Agent in Charge (ASAC) of the Tampa Field Division—removed Muldrow as the FBI point of contact for the COVID-19 Fraud Working Group in Tampa. *Id.* ¶¶ 183–86.

- In March 2020, Rehler "chastised" Muldrow for sending an email about the COVID-19 Fraud Working Group after 8:00 p.m. *Id.* ¶¶ 187–190.

- In March 2020, Rehler denied Muldrow's request for funding to purchase Microsoft Office for her laptop. The Special Agent in Charge (SAC), Michael McPherson, overrode Rehler's initial denial. *Id.* ¶¶ 191–93.

- When the COVID-19 pandemic started, Muldrow opted to work from home under FBI policy. Muldrow later returned to the office, but in July 2020, Muldrow stated that she would like to work from home again. Rehler told Muldrow that she could not return home a second time under FBI policy, though Muldrow alleges that there is no such prohibition under FBI policy. *Id.* ¶ 194.

- In July 2020, Muldrow worked on a thirty-day temporary duty travel assignment in Puerto Rico. On July 9, 2022, an unspecified employee at the Tampa Division shortened the travel assignment by two days and denied Muldrow a travel day to return from Puerto Rico. *Id.* ¶ 195.

- In February 2021, Rehler denied Muldrow's request to drive an FBI vehicle in a funeral processional for two fallen FBI agents. *Id.* ¶¶ 196–201.

5

The above discrete incidents comprise Muldrow's claims for disparate treatment discrimination and retaliation (counts one and three), but the heart of her Third Amended Complaint remains that the Tiering Policy disparately impacts women (count two). She argues that the FBI's facially neutral practice of posting "nonstationary" positions has a disparate impact on female applicants for field SSA positions. *Id.* ¶¶ 120–52. Muldrow alleges that women with children face more difficulty than men in working for extended periods of time at FBI Headquarters in Washington, D.C. Muldrow draws this conclusion because, in the United States labor force, working women are more likely than men to be married to a spouse that also works. *Id.* ¶ 144 (citing data from the United States Bureau of Labor Statistics). Muldrow alleges that "[w]hen an FBI agent's spouse does not work, that agent can more easily take a [temporary duty leave] or assignment to FBI [headquarters] while the non-working spouse stays in the district with their minor children." *Id.* ¶ 145. She also cites a 2021–22 FBI data chart, *see id.* ¶¶ 136–41, which shows that only 16% of the FBI's field supervisors are women, *id.* ¶ 138; 3d Am. Compl. Exhibit 1, but alleges that 19.8% of the FBI's criminal investigator population are women, *id.* ¶ 135.

This Court previously dismissed portions of Muldrow's Second Amended Complaint without prejudice because Muldrow failed to identify the appropriate statutory provisions for her disparate treatment and retaliation claims (citing private-sector

provisions of Title VII) and because Muldrow failed to plausibly allege a disparate impact claim. Order Granting MTD in Part (Doc. 77.) The Third Amended Complaint again alleges disparate treatment, disparate impact, and retaliation under Title VII. *Id.* ¶¶ 53–201. Like before, the Attorney General moves to dismiss the complaint with prejudice, arguing that Muldrow failed to exhaust several of the alleged grievances and that Muldrow fails to state a claim for relief under Rule 12(b)(6). *See* MTD.

## II.   LEGAL STANDARDS

### A. Rule 12(b)(6)

A complaint fails "to state a claim upon which relief can be granted" under Rule 12(b)(6) if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). The complaint must include more than "naked assertion[s]," "labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). Instead, the complaint must contain sufficient facts to state a claim that is "plausible on its face." *Ashcroft*, 556 U.S. at 678 (quotation omitted). A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

At the motion to dismiss stage, a plaintiff's factual allegations—but not legal conclusions—are assumed true and construed in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). I may not consider evidence outside of "the four corners of the complaint." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002); *see also Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) ("A court may consider only the complaint itself and any documents referred to in the complaint which are central to the claims.").

### B. Exhaustion

The Eleventh Circuit has held that the exhaustion requirement is "a jurisdictional prerequisite to filing a Title VII action" for federal employees. *Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999). That holding has been called into question now that the Supreme Court has ruled that Title VII's similar charge-filing requirement is "a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts." *Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 1851 (2019) (footnote omitted); *see also Hollis v. W. Acad. Charter, Inc.*, 782 F. App'x 951, 954 (11th Cir. 2019) (per curiam) (citing *Fort Bend* to classify the exhaustion requirement as nonjurisdictional). That said, *Crawford* still governs because it has not been explicitly overruled or undermined to the point of abrogation. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) ("[A] prior panel's holding is binding . . . unless and until it

8

is overruled or undermined to the point of abrogation by the Supreme Court or by [the Eleventh Circuit] sitting en banc. While an intervening decision of the Supreme Court can overrule the decision of a prior panel[,] . . . the Supreme Court decision must be clearly on point." (quotations and citations omitted)). Thus, a dismissal for a federal employee's lack of exhaustion is jurisdictional and accordingly entered without prejudice. *See Stalley v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

Accordingly, "exhaustion should be decided on a Rule 12(b) motion to dismiss." *Bryant v. Rich*, 530 F.3d 1368, 1375 (11th Cir. 2008). At this stage, the defendant bears the burden to prove that the plaintiff "failed to exhaust [her] available administrative remedies." *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). And where exhaustion "is treated as a matter in abatement and not an adjudication on the merits," it is appropriate "to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." *Bryant*, 530 F.3d at 1376 (footnotes omitted).

## III.   ANALYSIS

### A. Failure to Exhaust

"Before bringing a Title VII action in court, a federal employee must first seek relief from the agency where the alleged discrimination occurred." *Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239, 1243 (11th Cir. 2012). To adequately seek relief, a federal

employee must "initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory." *Id.* (quoting 29 C.F.R. § 1614.105(a)(1)). If the employee fails to contact a counselor within 45 days of the discriminatory action, his claim is ordinarily "barred." *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008).

The exhaustion requirement bars several of Muldrow's grievances. Muldrow alleges that Rehler denied Muldrow permission to work from home a second time due to COVID-19 concerns. 3d Am. Compl. ¶ 194. Muldrow also alleges that the FBI shortened her temporary duty assignment to Puerto Rico. *Id.* at ¶ 195. Because Muldrow never filed an EEO complaint about either of these events, she cannot premise her claims on them now. Similarly, Muldrow cannot premise her claims on the FBI's failure to adjudicate her SBAC appeal. Muldrow initiated the appeal in August 2019, *Id.* at ¶ 166, and alleges that the FBI retaliated against her by failing to adjudicate the appeal. *Id.* at ¶ 171. However, Muldrow never filed an EEO complaint about this incident, and therefore failed to exhaust this claim.

Muldrow argues that even if she did not exhaust some of the alleged incidents, all the incidents may be considered as proof of a hostile work environment as long as one incident occurred before the applicable exhaustion deadline. Resp. to MTD at 15–16 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). But Muldrow never alleged a hostile work environment claim, so the traditional exhaustion requirements

control. *See* 3d Am. Compl.; *see Morgan*, 536 U.S. at 105, 114. Nor can Muldrow

transform her claims in response to a motion to dismiss; she must have pleaded a hostile

work environment in the Third Amended Complaint. *See Dixon v. DTA Sec. Servs.*, No.

20-12040, 2021 WL 5320987, at *4–5 (11th Cir. Nov. 16, 2021) (per curiam) (refusing to

consider the plaintiff's hostile work environment claims because she never alleged one in

her complaint, as evidenced by the lack of the terms "hostile work environment,"

"harassment," or "abusive").

### B. Exhausted Claims

The Attorney General argues that Muldrow failed to exhaust two other claims. I

disagree. First, the Attorney General argues that Muldrow did not exhaust her claim that

reposting the Squad 10 SSA position as stationary constituted disparate treatment. MTD

at 15–16. That argument construes the exhaustion rule too narrowly. The relevant inquiry

is whether Muldrow's complaint is "related to" or "grew out of" her administrative

complaint. *Gregory v. Georgia Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004).

Muldrow complained that her nonselection for the Squad 10 SSA position was disparate

treatment due to sex. Resp. to MTD Exhibit 1 at 6–8. The reposting of that same position

as stationary is part-and-parcel of her allegation of disparate treatment.

Second, the Attorney General argues that Muldrow did not exhaust her claims

regarding the Squad 11 SSA position. On May 24, 2021, the FBI posted the Squad 11

SSA position as "nonstationary." 3d Am. Compl. ¶ 113. A day later, Muldrow emailed

SAC McPherson and explained that she intended to apply for the position and requested

that McPherson repost the Squad 11 SSA position as "flex." *Id.* ¶¶ 114–15. Muldrow

alleges that McPherson never responded to her email and that a male candidate was

selected because the position remained "nonstationary." *Id.* ¶¶ 115, 118. Muldrow alleges

that McPherson's failure to respond and the FBI's "nonstationary" posting constituted

disparate treatment and retaliation. *Id.* ¶¶ 112–119; 181.

Muldrow e-mailed McPherson on May 25, 2021, but did not seek counseling until

August 30, 2021. 3d Am. Compl. ¶ 114; Resp. to MTD Exhibit 5. The Attorney General

argues that Muldrow failed to exhaust this incident because she waited over 45 days after

sending the email "and presumably more than 45 days after the alleged failure could

theoretically and reasonably have culminated in a purportedly discriminatory or retaliatory

act." MTD at 23. But Muldrow's complaint alleges that McPherson's failure to respond

was an aspect of the discrimination she faced when applying for the Squad 11 SSA position.

3d Am. Compl. ¶¶ 112–19. Thus, the clock for filing an EEO complaint did not

necessarily start ticking the moment after Muldrow sent the email; it became legally

material at the time that the FBI proceeded with the selection process for the Squad 11

SSA position without regard for Muldrow's request. Although it is unclear when the FBI

began the selection process, the Court may not simply "presum[e]" that Muldrow failed to

exhaust within the applicable 45-day deadline. MTD at 23. The Attorney General bears the burden of proving that Muldrow failed to exhaust. *Turner*, 541 F.3d at 1082. Because the Attorney General failed to carry his burden, I will consider Muldrow's intentional discrimination and retaliation claims regarding the Squad 11 SSA selection process.

### C. Disparate Impact

When Muldrow's Second Amended Complaint was dismissed, she was warned that any amendment for the disparate impact claim must "allege facts that would make it plausible that a statistically significant disparity exists between the percentage of women who applied and were hired as field supervisors and the percentage of men who applied and were hired." *Id.* at 9. Although no Eleventh Circuit precedent specifies what precisely a plaintiff must allege to state a claim for relief of disparate impact, this Court explained its view based on persuasive authority that "a plaintiff 'usually' must cite 'a statistical disparity' to plausibly allege a disparate impact claim." *Id.* (citing *Pouyeh v. UAB Dep't of Ophthalmology*, 625 F. App'x 495, 497 (11th Cir. 2015); *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020)). Muldrow's Third Amended Complaint—the operative pleading—concedes that she does not allege any statistics comparing "the percentage of women who applied and were hired as field supervisors and the percentage of men who applied and were hired." 3d Am. Compl. ¶ 132.

An employer commits disparate impact sex discrimination if facially neutral employment practices have "an adverse, disproportionate impact" on women. *Joe's Stone Crab I*, 220 F.3d at 1274; *see also Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1520 (11th Cir. 1995). For a disparate impact claim, a plaintiff "must establish three elements: first, that there is a significant statistical disparity between the proportion of women in the available labor pool and the proportion of women hired; second, that there is a specific, facially-neutral, employment practice which is the alleged cause of the disparity; and finally . . . that a causal nexus exists between the specific employment practice identified and the statistical disparity shown." *Joe's Stone Crab I*, 220 F.3d at 1274.

To make this kind of claim plausible and survive a motion to dismiss, a plaintiff "usually" must allege "a statistical disparity" between the relevant comparators. *Pouyeh*, 625 F. App'x at 497; *Mandala*, 975 F.3d at 209. The mere fact that significantly more men than women occupy a job is not sufficient to show disparate impact discrimination. *Joe's Stone Crab I*, 220 F.3d at 1276. The Eleventh Circuit has instead focused on whether "a statistically-significant disparity exists between the percentage of women who actually applied . . . and the percentage of women who were hired." *Id.* at 1275. "[T]he statistics must plausibly suggest that the challenged practice *actually* has a disparate impact," and the statistics must also "focus on the disparity between appropriate comparator groups." *Mandala*, 975 F.3d at 210.

14

Like the last iteration, Muldrow's complaint might make a disparate impact "conceivable," but it does not allege facts crossing into the "plausible." *See Iqbal*, 556 U.S. at 680. Muldrow proffers why a facially neutral FBI policy might have a disparate impact on women. 3d Am. Compl. at ¶¶ 120–52. Muldrow's hypothesis is that fewer women are hired as field supervisors because the positions are awarded to agents who can gain experience at FBI headquarters, and women are less likely than men to do that because they are more likely to have childrearing responsibilities. *Id.* Muldrow never alleges any statistical evidence showing a disparity between the percentage of FBI female agents who applied and were hired as SSAs and the percentage of FBI male agents who applied and were hired for those same positions. In fact, Muldrow admits that she cannot cite to any such statistically significant evidence.

I remain persuaded that, "[t]o make out a disparate-impact claim," the plaintiff's complaint must include "factual allegations—usually a statistical disparity—demonstrating a disparity in treatment between groups so significant that it supports an inference that discrimination is the cause." *Pouyeh*, 625 F. App'x at 497. The ordinary need for statistical disparity allegations in disparate impact claims is consistent with the pleading standard articulated by the Supreme Court.

*Twombly* explained that Rule 12(b)(6) is designed to protect defendants and the federal court system from "largely groundless" claims that needlessly waste time and

resources. 550 U.S. at 557–58 (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Discovery is expensive, and "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings." *Id.* at 559. Therefore, "it is only by taking care to require [well-pleaded] allegations . . . that [courts] can hope to avoid the potentially enormous expense of discovery." *Id.* Although *Twombly* focused on Sherman Act claims, *see* 550 U.S. 544, *Iqbal* held that *Twombly*'s pleading standard is broadly applicable. *See* 556 U.S. 662.

Requiring a statistical disparity allegation between relevant comparators is consistent with *Twombly* and *Iqbal* because it requires a plaintiff alleging disparate impact claims to plausibly allege a claim for relief before the defendant is subjected to discovery and litigation. Disparate impact claims implicate whole companies and agencies. Through discovery, defendants must provide data about their entire workforce, which is time consuming, expensive, and uniquely invasive. Under *Twombly* and *Iqbal*, a plaintiff cannot simply guess about the possibility of a disparate impact without any allegations that make such an inference reasonable and "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And ordinarily, a statistical disparity between the right comparators makes the claim plausible.

This understanding of how the pleading standard applies to disparate impact claims comports with the Second Circuit's reasoning in *Mandala*, 975 F.3d 202:

To nudge a disparate impact claim across the line from conceivable to plausible—and, indeed, to ultimately prove such a claim—plaintiffs typically rely on statistical evidence to show a disparity in outcome between groups. . . . At the prima facie stage, a plaintiff's statistical analysis must demonstrate that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity. . . [E]ven at this early juncture, the statistics must plausibly suggest that the challenged practice actually has a disparate impact.

*Id.* at 209–10 (quotation and brackets omitted). Further, the Second Circuit explained that "the statistical analysis must reveal disparities between populations that are relevant to the claim the plaintiff seeks to prove." *Id.* at 210. Lastly, "national figures will not always be a viable alternative," and "[g]eneral population statistics are a reliable surrogate only when there is reason to think that they accurately reflect the pool of qualified job applicants for the position in question." *Id.* at 210–11 (quotation omitted). As explained above, Muldrow's complaint fails to include any FBI-specific statistics that compare the appropriate groups.

For all the above reasons, a statistically significant disparity must ordinarily be alleged for a disparate impact claim. But it is possible for a plaintiff to allege facts that make a disparate impact claim plausible without that data. Muldrow's allegations, however, do not. She relies on a 2021–22 FBI data chart found in Exhibit 1 of the Third Amended Complaint, showing that there are 1,181 FBI field supervisors in total and only 191 of them are women (16%). *See* 3d Am. Compl. ¶¶ 136–41; 3d Am. Compl. Exhibit 1. To

compare, Muldrow alleges that 19.8% of all FBI criminal investigators are women. 3d Am. Compl. ¶ 135. Muldrow contends that these figures are sufficient to plausibly allege a disparate impact at the pleading stage, presumably because the 3.8% delta provides a sufficient inference of a disparate impact. 3d Am. Compl. ¶ 133.

Even if I assume that all the female FBI criminal investigators (the population constituting the 19.8% figure) are special agents eligible to apply for SSA-level positions, who applied for SSA-level positions, and that the figures show a significant statistical disparity, I still do not agree that Muldrow's allegations suffice. First, there are no allegations about what percentage of these women have FBI headquarter experience. Without knowing what percentage of the relevant female labor pool lacked the credential that is the subject of the neutral policy, Muldrow fails to allege facts that make a "causal nexus" between the Tiering Policy and the 3.8% delta plausible. Second, there are no allegations regarding how often the FBI posts "stationary" or "flex" versus "nonstationary" SSA positions. Again, without knowing the percentage of field versus headquarter preferences in the postings, Muldrow fails to allege facts that make a "causal nexus" between the Tiering Policy and the 3.8% differential plausible.

Thus, Muldrow fails to plausibly allege that the FBI's Tiering Policy creates a disparate impact.

### D. Failure to Apply for the Panama Express SSA Position

Muldrow alleges that the FBI discriminated and retaliated against her by posting the Panama Express SSA position as nonstationary, albeit she concedes that she did not apply for the position. 3d Am. Compl. ¶¶ 99–107; 180. The Attorney General argues that, without applying for the position, Muldrow suffered no adverse personnel action. MTD at 19–22. Muldrow alleges that the futile gesture doctrine excuses her failure to apply. 3d Am. Compl. ¶ 104; Doc. 92 at 10–12.

Section 2000e-16, the provision of Title VII providing the exclusive judicial remedy for claims of discrimination in federal employment, precludes an action for discrimination premised on a plaintiff not receiving a job for which she failed to apply. *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976); *Carter v. Sec'y of Navy*, 492 F. App'x 50, 53 (11th Cir. 2012) (per curiam). Section 2000e-16(a) requires that all "personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based" on protected characteristics. Although "personnel actions" include promotions, no personnel action takes place when a plaintiff fails to apply for the job at issue. *See Babb v. Wilkie (Babb I)*, 140 S. Ct. 1168, 1173 (2020) (noting that "personnel

action" includes "most employment-related decisions, such as . . . promotion[s]") (citing 5 U.S.C. § 2302(a)(2)(A)).

The exception to this general rule arises if applying for a job would be a futile gesture. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977). That occurs when the plaintiff "refrained from applying due to a justifiable belief that the employer's discriminatory practices made application a futile gesture." *E.E.O.C. v. Joe's Stone Crabs, Inc. (Joe's Stone Crabs II)*, 296 F.3d 1265, 1274 (11th Cir. 2002). To allege such a "justifiable belief," Muldrow must allege that she (1) "had a real and present interest in the job for which the employer was seeking applications; and (2) that she would have applied for the job but effectively was deterred from doing so by the employer's discriminatory practices." *Id.*

Muldrow conclusively alleges that she had a "real and present interest" in the Panama SSA position. 3d Am. Compl. ¶ 104. Assuming that she did, Muldrow still fails to plausibly allege a "justifiable belief" that she was deterred from applying for the job by the FBI's discriminatory practices. *Joe's Stone Crabs II*, 296 F.3d at 1274. The futile gesture doctrine requires that the prospective applicant be deterred by "discriminatory hiring practices." *Id.* at 1275. Prospective applicants must be deterred by the discriminatory reputation of the employer, and the employer must perpetuate a discriminatory reputation through "some intentional affirmative act." *Id.* This doctrine seeks to protect "victims of

the most entrenched forms of discrimination" who have been totally deterred from submitting job applications. *Int'l Bhd. of Teamsters*, 431 U.S. at 367. Thus, a plaintiff cannot employ the futile gesture doctrine if the employer would deny the plaintiff for neutral reasons that have "no direct connection to" the plaintiff's protected characteristics. *Williams v. VWR Int'l, LLC*, 685 F. App'x 885, 889 (11th Cir. 2017); *Laosebikan v. Coca-Cola Co.*, 167 F. App'x 758, 763 (11th Cir. 2006).

Muldrow alleges that she did not apply for the Panama Express SSA position because it was "nonstationary," and Muldrow knew that she would not be competitive for the position. 3d Am. Compl. ¶¶ 100–04. But listing a position as "nonstationary" has no direct connection to Muldrow's sex. A "nonstationary" position is one that prefers candidates from FBI headquarters, not candidates of a certain sex. *Id.* ¶ 46. Muldrow cannot invoke the futile gesture doctrine if she was deterred from applying because of a neutral hiring practice that was not explicitly discriminatory.

### E. Disparate Treatment Discrimination

Muldrow exhausted four incidents related to her disparate treatment discrimination claim. She alleges that the FBI intentionally discriminated against her after she applied for the Squad 10 SSA position, the First Squad 9 SSA position, the Second Squad 9 SSA

position, and the Squad 11 SSA position. 3d Am. Compl. ¶¶ 57–77, 94–98, 108–19. However, Muldrow fails to plausibly allege disparate treatment based on sex.

For a disparate treatment claim under Title VII, Muldrow must allege facts that suggest intentional discrimination. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). If a plaintiff cannot point to direct evidence, a plaintiff may allege intentional discrimination with circumstantial evidence under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). But at the pleading state, a complaint "need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case." *Surtain*, 789 F.3d at 1246 (quotation omitted). Instead, the complaint most only allege facts that "plausibly suggest that the plaintiff suffered an adverse employment action due to intentional . . . discrimination." *Id.*

Muldrow's complaint fails to carry this light burden. Muldrow alleges that the FBI discriminated against her because of her sex and awarded promotions to "pre-selected, favored male candidates." 3d Am. Compl. ¶¶ 62, 77, 87, 94–95, 100, 106, 108–110. She

falters though in alleging facts that suggest intentional discrimination. *Surtain*, 789 F.3d at 1246.

First, her allegations related to the Squad 10 SSA position do not raise an inference of intentional sex discrimination. She alleges that she was initially ranked as the number one candidate and that she was not granted an interview once the position was reposted as nonstationary. 3d Am. Compl. ¶ 88. But as already discussed, the FBI's Tiering Policy is facially neutral. Therefore, their application—including the decision to reclassify a position as "nonstationary"—does not raise an inference of intentional discrimination without more. Nor do Muldrow's other allegations move the needle. She alleges that she was told that she should take a temporary duty assignment to FBI headquarters, that she replied that she could not get childcare, and that she was told she would have to make a choice between her family commitments and her career. *Id.* ¶ 73. Yet she fails to allege any discriminatory comments connecting her sex with her inability to take an assignment at FBI headquarters. While she hypothesizes in her disparate impact claim that sex and childcare responsibilities are linked, that link alone cannot support a disparate *treatment* claim.

Second, with respect to the First Squad 9 SSA position that was posted as "flex," Muldrow alleges that the FBI awarded the position to a male candidate and that the FBI "artificially rated" the male candidate's application "extremely high." *Id.* ¶¶ 94–97. But Muldrow never alleges how that rating was artificially high or that the selected candidate

23

was "equally or less qualified" than Muldrow. *Id.* Although Muldrow spends many pages recounting her experience, awards, and accolades, *id.* ¶¶ 18–33, she makes no allegation concerning this particular candidate's qualifications. Thus, I cannot draw a reasonable inference that he was equally or less qualified than herself.

Third, Muldrow fails to plausibly allege a prima facie case of disparate treatment with respect to the Second Squad 9 SSA promotion that was posted as "flex." Although Muldrow alleges that the "favored, pre-selected Tampa male candidate" had "much less experience" than herself, *id.* ¶ 111, she does not allege facts that establish his experience relative to hers. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. And even assuming that "much less experience" refers to length of service, that fact would not allow a reasonable inference that she was equally or more *qualified* than the other candidate. The tenure of an FBI agent alone may or may not be relevant to a particular position's requirements. And Muldrow alleges no facts about this position or the other aspects of this candidate that make it plausible he was "equally or less qualified" than herself.

Lastly, Muldrow fails to allege a prima face case of intentional discrimination with respect to the Squad 11 SSA promotion that was posted as "nonstationary." She alleges that she had better skill ratings than the male applicant that was ultimately promoted. 3d

Am. Compl. ¶ 118. But Muldrow also acknowledges that—because the Squad 11 SSA position was "nonstationary" and "only Tier I candidates" for the position would be ranked, *id.* ¶¶ 113–17—she would be ranked lower as a Tier II candidate "regardless of ratings," *id.* ¶ 46. Thus, because the FBI's Tiering Policy preferred candidates for the Squad 11 SSA position with headquarter experience, Muldrow and other non-Tier 1 candidates were not equally or more qualified for the position than Tier 1 candidates based on the FBI's criteria. Her factual allegations give rise to the reasonable inference that the FBI prefers headquarter experience for certain SSA positions even if those candidates score lower on primary competencies; but those allegations and the resulting inference do not make it plausible that Muldrow's sex was the cause of differential treatment. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (explaining that "an employer need not have good cause for its decisions" as long as it does not unlawfully discriminate (quotations and citations omitted)).

Muldrow fails to plausibly allege that the FBI treated her differently based on her sex in not awarding her these four promotions.

### F. Retaliation

Muldrow alleges that the FBI retaliated against her by:

- Listing the Squad 11 SSA position as "nonstationary," 3d Am. Compl. ¶ 181;

- Removing Muldrow as the FBI point of contact for the COVID-19 Fraud Working

Group in Tampa, *id.* ¶¶ 183–86;

- Scolding Muldrow for sending an email about the COVID-19 Fraud Working Group after 8:00 p.m., *id.* ¶¶ 187–190;

- Initially denying Muldrow's request for funding to purchase Microsoft Office for her laptop (though the denial was later reversed), *id.* ¶¶ 191–93; and

- Denying Muldrow's request to drive an FBI vehicle in a funeral processional for two fallen FBI agents, *id.* ¶¶ 196–201.

Although Muldrow exhausted each of these incidents, (*see* Doc. 92-3; Doc. 92-4; Doc. 92-5), the Attorney General moves to dismiss Muldrow's retaliation claim for failure to state a claim under Title VII. MTD at 24–28.

To make a prima facie retaliation claim, Muldrow must allege three elements: (1) she engaged in statutorily protected activity; (2) her employer acted adversely against her; and (3) there is a causal relation between the protected activity and the adverse action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001); *Herron-Williams v. Ala. State Univ.*, 805 F. App'x 622, 631 (11th Cir. 2020). The Attorney General argues that Muldrow fails to adequately allege the second and third elements. MTD at 24–27.

Because the Attorney General is correct that the alleged retaliation is not materially adverse under the second element, I do not address the third element.

Eleventh Circuit precedent is unclear regarding what constitutes adverse employment action in Title VII federal-sector retaliation claims. Private-sector retaliation claims are advanced under 42 U.S.C. § 2000e-3, which states, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." *Id.* § 2000e-3(a). *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006), held that section 2000e-3 "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." Rather, a retaliatory action is "materially adverse" if the employer's actions are so harmful that they could "well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*

Comparatively, federal-sector retaliation claims are advanced under 42 U.S.C. § 2000e-16(a), which prohibits "[a]ll [retaliatory] *personnel actions* affecting employees." (emphasis added). Citing *Babb v. Secretary, Depart of Veteran Affairs*, 992 F.3d 1193 (2021) (*Babb II*), the Attorney General argues that retaliatory action in the federal-sector must be "personnel action" to be materially adverse under § 2000e-16(a). MTD at 24. Indeed, *Babb II* states, "The text of the federal-sector provision addresses 'personnel

actions,' and so it seems clear enough that an actionable . . . claim must describe conduct that rises to that level." 992 F.3d at 1209. And the Supreme Court understood the term "personnel action"—as used in "the ADEA's nearly identical federal-sector provision"—to mean " 'most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews.' " *Id.* at 1199 (quoting *Babb v. Wilkie*, 140 S. Ct. 1168, 1173 (2020)).

Confusingly, *Babb II* also states that *Burlington Northern* applies to the federal-sector prohibition on retaliation. *Id.*; *see also Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 836 (11th Cir. 2021); *Varnedoe v. Postmaster Gen.*, No. 21-11186, 2022 WL 35614, at *2 n.1 (11th Cir. Jan. 4, 2022). And part of *Burlington Northern*'s point is that section 2000e-3 encompasses retaliatory acts beyond actions "related to employment." 548 U.S. at 57.

Yet *Babb II* relies on *Burlington Northern* to establish what level of harassment is sufficient for a hostile-workplace retaliation claim, not to read the phrase "personnel actions," 42 U.S.C. § 2000e-16(a), out of the law. In context, the Eleventh Circuit was agreeing with the position of the plaintiff in that case. *Babb II*, 992 F.3d at 1209. The plaintiff conceded that the federal-sector provision was limited to personnel actions, but disputed that hostile-workplace retaliation claims must consequently be "severe or

28

pervasive." *Id.* And because Muldrow does not allege retaliation involving a hostile workplace, the "severe or pervasive" standard is inapplicable.

Nevertheless, Muldrow's claims would still fail regardless of whether the "personnel action" limitation applies. I will analyze whether the FBI's retaliatory acts were materially adverse under *Burlington Northern*. The inquiry must focus, then, on whether there was *any* retaliatory act that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 57.

Even under the lower standard of *Burlington Northern*, none of Muldrow's exhausted claims satisfy the materially adverse standard when compared to how the Eleventh Circuit has handled other claims. Verbally threatening an employee's physical safety and threating to fire the employee's fiancé could "dissuade a reasonable worker" under *Burlington Northern. Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862–63 (11th Cir. 2020); *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011). But threatening an employee with a countersuit or placing the employee on paid suspension is not materially adverse. *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021); *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 649–50 (11th Cir. 2019). Muldrow's allegations of retaliation are much less notable than even the latter non-cognizable examples.

First, Muldrow alleges that the FBI retaliated against her by posting the Squad 10 and Squad 11 SSA position as "nonstationary." 3d Am. Compl. ¶ 181. But as Muldrow

acknowledges in her complaint, classifying a promotion as "nonstationary" is standard practice under the FBI's Tiering Policy. *Id.* ¶ 46. The designation of these postings would not "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57.

Further, Muldrow alleges that she emailed the SAC of the Tampa Division and requested that he repost the position as "flex" so that she could better compete for the position. 3d Am. Compl. ¶¶ 114–15. Muldrow alleges that the SAC retaliated by never responding to her email or reposting the Squad 11 SSA position as "flex," *id.*, but neither would dissuade a reasonable worker from bringing a charge of discrimination. The SAC may have failed to respond for any number of reasons; perhaps he never saw the message, did not have time to respond, or did not want to respond. Moreover, the SAC could refuse to reclassify the position for many neutral reasons, including that he did not want to set a precedent for employees demanding that leadership reclassify promotions. Whatever the reason for not responding to Muldrow's email or request, the failures to respond do not constitute retaliation.

Next, Muldrow alleges that ASAC Rehler retaliated against her by scolding her for sending an email about the COVID-19 Fraud Working Group after 8:00 p.m., *id.* ¶¶ 187–190; denying Muldrow's request for funding to purchase Microsoft Office for her laptop, *id.* ¶¶ 191–93; and denying Muldrow's request to drive an FBI vehicle in a funeral

procession, *id.* ¶¶ 196–201. But none of these actions "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57. Muldrow herself refers to Rehler's reprimand about emails as "petty retaliatory action." 3d Am. Compl. ¶ 190. And none of these actions are like threats to fire an employee's fiancé or threats to harm one's physical safety. *See Monaghan*, 955 F.3d at 862–63; *Thompson*, 562 U.S. at 174.

Lastly, Muldrow alleges that Rehler retaliated by removing Muldrow as the FBI point of contact for the COVID-19 Fraud Working Group in Tampa. 3d Am. Compl. ¶¶ 183–86. But Muldrow was never fired, and "reassignment of job duties is not automatically actionable." *Burlington Northern*, 548 U.S. at 71. "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (quotation omitted). For instance, in *Burlington Northern*, the Court held that a reassignment was materially adverse because the plaintiff was reassigned to tasks that were "more arduous," "dirtier," required lower qualifications, and included less prestige. *Id.* Here, Muldrow fails to allege that she was disadvantaged, in any way, by the removal of the designation as point of contact for the COVID-19 group. Further, Muldrow does not allege that she was reassigned to more difficult or demeaning tasks.

Overall, because Muldrow fails to allege any retaliatory activity that is materially adverse under section 2000e-16, she fails to state a retaliation claim under Rule 12(b)(6).

## IV.   CONCLUSION

Because Muldrow fails plausibly to allege disparate treatment discrimination, disparate impact discrimination, or retaliation, she fails to state a claim for relief. Accordingly, the unexhausted claims are **DISMISSED without prejudice** and the remaining claims are **DISMISSED with prejudice**. The Clerk is directed to terminate any pending motion and deadline, and to close this case.

**ORDERED** in Tampa, Florida, on September 30, 2023.

Kathryn Kimball Mizelle
United States District Judge